**Ermina D'ANTONIO, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. C–1–80–578.**

United States District Court, S.D. Ohio, W.D.

Feb. 4, 1983.

Joseph M. Corabi, Steubenville, Ohio, Mark P. Friedlander, Jr., Arlington, Va., for plaintiff.

Joseph E. Kane, Donetta D. Wiethe, Asst. U.S. Attys., Cincinnati, Ohio, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SPIEGEL, District Judge:

This action is brought pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346, 2671 *et seq.* and the National Swine Flu Immunization Program Act, 42 U.S.C. § 247b. This suit was filed on April 11, 1980. It was subsequently transferred to the United States District Court for the District of Columbia pursuant to a transfer order from the Judicial Panel on Multidistrict Litigation (MDL). After consolidated pretrial proceedings, the case was remanded to this Court for further proceedings and trial. This case was tried as a bifurcated trial in Stuebenville, Ohio on January 3 and 4, 1983 and in Cincinnati, Ohio on January 5, 6 and 7, 1983.

The plaintiff Ermina D'Antonio alleges she contracted Guillain-Barre syndrome (GBS) as a direct result of a swine flu inoculation which she received on or about October 30, 1976. Plaintiff seeks damages for temporary and permanent injuries resulting from the GBS.

In August of 1976 Congress enacted the Swine Flu Act, substituting the United States as the only party liable for damages resulting from an inoculation of swine flu vaccine. It further established the FTCA as the vehicle for asserting any claims against the government. A comprehensive history of the Swine Flu Act is reported in several cases and will not be repeated here. For a thorough analysis *see Hunt v. United States,* 636 F.2d 580 (D.C.Cir.1980). For the reasons set forth below we find that Ermina D'Antonio has proven by a preponderance of the evidence that her GBS was caused by the swine flu vaccine.

The following constitutes our findings and conclusions on the issue of causation.

## FINDINGS OF FACT

### BACKGROUND

The plaintiff, Ermina D'Antonio was born on February 11, 1912 in Mingo Junction, Ohio. She lived in Mingo Junction all

of her life until she contracted GBS at which time she had to move to Stuebenville, Ohio. Plaintiff was in general good health, working as a bookkeeping and office manager for a beer distributor in Mingo Junction at the time she received a swine flu shot on October 30, 1976. She had worked there for thirty-four years. Plaintiff was able to easily walk up and down the steep hillsides of her Mingo Junction home, remain on her feet at work when required, and pursue a vigorous life. She did see her family physician, Dr. Paul W. Ruksha whenever she had a physical problem. Plaintiff was known to have a nervous condition for which Dr. Ruksha had prescribed tranquilizers for a number of years. Dr. Ruksha also treated plaintiff for fatigue over a number of years for which he administered shots of B-12.

Plaintiff received the swine flu shot on October 30, 1976. She experienced no immediate reaction to the vaccine. By late December of 1976 plaintiff began to experience pervasive symptoms of fatiguing and tiring easily. This caused a significant change in her living pattern and instead of watching television or visiting relatives and friends as she usually did, she went to bed early and went to sleep. Although she continued to go to work on a daily basis she found it necessary to "push" herself to accomplish the same tasks. At this point, plaintiff believed that something serious was happening to her but she did not know what it was. She did not seek any medical attention from Dr. Ruksha or any other physician until January 24, 1977.

By mid-January, 1977 plaintiff began to feel like she had some sort of virus. She was nauseous and her abdomen ached. On January 24, 1977 she went to see Dr. Ruksha and told him that she had been sick for a few days. She complained of fatigue, diarrhea, dry tongue, and pain in her entire abdomen area. She had a temperature of ninety-nine degrees. Dr. Ruksha gave her lomatil, sumycin (antibiotic) and a shot of B-12.

Plaintiff took the medicine that Dr. Ruksha had prescribed but continued to feel worse. It is unclear whether she went back to work after seeing Dr. Ruksha on January 24 but by January 26, 1977 plaintiff was very ill. She was lying down about 7:00 in the evening and felt an intense pain on her right side in addition to the nausea and aching described above. Plaintiff called Dr. Ruksha's nurse who told her to put ice on her side. At 9:30 plaintiff felt much worse. She called the nurse back and the nurse told her to go to the emergency room. Plaintiff took a cab to Ohio Valley Hospital in Stuebenville, Ohio about 10:00 p.m. She first saw Dr. Meyers in the emergency room and then Dr. Ruksha arrived at the hospital and examined her. Dr. Ruksha asked that plaintiff be examined by Dr. Licata, a general surgeon.

Dr. Ruksha and Dr. Licata initially believed that plaintiff had appendicitis. The hospital examination indicated plaintiff had a slight fever, rebound tenderness, guarding and white blood cell count of twenty-two thousand with shift to the left. A neurological exam also was performed. Plaintiff was taken to the operating room where Dr. Licata performed an emergency appendectomy. After making the incision and removing the appendix, Dr. Licata found it to be healthy, but removed it anyway. Thereupon he made an examination of the lower abdominal area and found it free of infection. He also found that the blood vessels that ordinarily supply blood to the stomach area were not gorged and swollen or inflamed as he would have expected to find if she had been suffering from some infectious process.

Dr. Licata noted in the record the "possibility of gastroenteritis", but testified that he made that entry only because he did not know what else could be wrong with the plaintiff. Later, as her symptoms progressed into the acute paralytic stage, he concluded that she had not had gastroenteritis at the time she was admitted to the hospital but rather that the symptoms were a part of the developing neurological disease.

Plaintiff did not improve following surgery. She found that she could not get out of bed without assistance and complained to Dr. Licata of her symptomology. Dr. Licata testified that plaintiff did make complaints immediately following surgery but that he ignored them because they were not consistent with symptoms he believed a patient would experience following surgery. By January 30, 1977 the plaintiff reported tingling and a paralysis significant enough so that she could not walk without assistance. Dr. Ruksha became concerned at this time that she was suffering from GBS and called in Dr. Amrick Chattha, a neurologist, on February 2, 1977. Dr. Chattha performed a neurological examination of plaintiff which disclosed motor weakness of all four extremities and an absence of reflexes. A spinal tap also was performed which indicated an elevated protein count in the spinal fluid. Dr. Chattha diagnosed plaintiff as suffering from GBS and recommended that she be transferred to the intensive care unit.

By February 3, 1977 the GBS had progressed to a degree of paralysis that required intubation to assist the plaintiff in breathing. On February 5, 1977 a tracheotomy was performed by Dr. Joseph Agresta, an otolaryngologist. Dr. Agresta observed at the time that plaintiff was essentially totally paralyzed and required life support systems to stay alive.

Plaintiff's GBS continued to progress and by February 21, 1977 a gastrostomy was performed to assist her with her eating. Shortly thereafter, plaintiff's GBS began to plateau and she began to recover in late February of 1977. She continued to improve for several months and was discharged from the Ohio Valley Hospital on April 6, 1977. After a period in a rehabilitation center, plaintiff returned home. In June of 1978 plaintiff moved to Stuebenville, Ohio because she could not climb the hill leading to her house in Mingo Junction.

GBS has been associated with numerous antecedent events, and in this case the question was which, if any, of three relevant events caused plaintiff's GBS: the vaccination, occurring on October 30, 1976; the alleged gastroenteritis or gastrointestinal infection, occuring on January 22, 1977; or the operation, occuring on January 26, 1977. Plaintiff asserted that she never had a gastrointestinal illness or infection and that the nausea and abdominal pain she experienced in late January of 1977 were symptoms of her GBS already in progress. Plaintiff asserted further that she had experienced sub-clinical symptoms of GBS as early as mid-December of 1976, evidenced by severe fatigue and weakness and that her GBS was caused by the swine flu shot. It was the government's position that the onset of the GBS began on January 30, 1977 that being the first hospital record made of the neurological symptoms of tingling and inability to walk. It was further defendant's position that the events closer in time to the onset of the GBS were the most likely causes and, finally, that a case of GBS that did not begin until the thirteenth week after the vaccination was, because of epidemiological studies, not provable as causally connected. The expert witnesses called by the respective parties dealt with these issues.

## MEDICAL TESTIMONY

Dr. Amerik Chattha, plaintiff's treating neurologist, testified that he first saw the plaintiff on February 2, 1977. At that time plaintiff was not able to move her extremities and her respiratory muscles were paralyzed. Dr. Chattha testified further that plaintiff reached the nadir of her disease one day later when she was completely paralyzed and unable to breath. It was his opinion, based on a reasonable degree of medical certainty, that the operation that plaintiff had undergone on January 26 was not the cause of her GBS. He stated that most cases of GBS that appear to be caused by surgery, follow the surgery by one week to ten days. Because plaintiff had visible symptoms of GBS three days after surgery, it was Dr. Chattha's conclusion that there was no causal relationship.

Dr. Chattha testified further that there was no way of determining exactly when

plaintiff's GBS began. He stated that even though the hospital record showed that a neurological exam was performed upon plaintiff's admission to the hospital, she was not seen by a neurologist and only a neurologist would be able to detect subtle signs of neurological problems. He further opined that it was not possible to set an absolute limit on the time between an antecedent event and a resulting illness. With regard to the study performed by the Center for Disease Control (CDC) he agreed that the incidence of GBS after the shot gradually decreased over time, but believed it was not possible to conclude from this that there was no relationship between the swine flu shot and GBS after ten weeks.

Dr. Chattha testified further that he did not believe that any gastrointestinal illness plaintiff might have suffered would have caused her GBS. In his experience a gastrointestinal illness generally occurs two to three weeks prior to the onset of severe symptoms and he believed that in this case the nadir of plaintiff's GBS was too close in time to plaintiff's alleged gastrointestinal illness for the illness to have caused the GBS. He did state, however, that it was possible that GBS could follow a gastrointestinal illness by a week and that he was not, therefore, one hundred percent sure that the swine flu shot caused plaintiff's GBS.

Dr. Antonio Licata, a surgeon and a treating physician, testified that in his opinion, based on a reasonable degree of medical certainty, that the plaintiff did not suffer gastroenteritis. Dr. Licata testified that he first saw plaintiff on January 26, 1977 at which time she was exhibiting symptoms of appendicitis. She had abdominal pain and a condition known as "rebound tenderness" which indicates internal abdominal problems. She also had a high white blood count. When he operated, however, he found a normal appendix which he removed anyway per normal procedure. In his post-surgery notes he indicated that plaintiff had gastroenteritis but soon changed his mind when she developed symptoms of GBS so quickly after the operation. He testified that she did make some general non-specific complaints to him following surgery but because they appeared to be unrelated to the surgery and because she is known to be an emotional woman, he basically ignored her complaints. Dr. Licata testified that rebound tenderness is usually not a symptom of gastroenteritis or a gastrointestinal infection. His opinion was further based on the fact that patients generally recover quickly from gastroenteritis and, in this case, plaintiff continued to get worse. Moreover, Dr. Licata noted that he thoroughly examined plaintiff's abdomen during surgery and that it looked normal and exhibited no sign of infection or inflammation. He stated that the only reason he wrote in his hospital notes that plaintiff had gastroenteritis was that he felt he had to write something down and he was unable to determine what was wrong with her.

Dr. Charles M. Poser, a prominent neurologist, also testified on behalf of the plaintiff. It was his opinion, to a reasonable degree of medical certainty, that the plaintiff's GBS was causally connected with the swine flu vaccination she received on October 30, 1976.

Although the exact cause of GBS is not known it is generally recognized as an auto-immune disease wherein stimulated antibodies become misdirected and attack the patient's peripheral nervous system instead of, or in addition to, the foreign substance. This attack causes lesions in the myelin sheath, the substance providing protection or covering to the nerve axons. It is Dr. Poser's opinion that once this process is begun, the disease may lie dormant for a number of weeks or months exhibiting subclinical symptoms only. This occurs according to Dr. Poser because nerves have certain protection factors and each person responds differently depending on the nerve involved. In fact, the nerves have so many protection factors that a nerve can lose some of its sheath without affecting an individual's behavior or performance. This has been shown in persons who have recovered from GBS and have no more

symptoms but have remaining damage to the nerve sheath.

It was Dr. Poser's opinion that the onset of plaintiff's GBS began with the first mild sub-clinical symptoms which appeared in late December of 1976, seven to nine weeks after the injection of the vaccine. Dr. Poser testified that the fatigue suffered by plaintiff in December was a "bridging symptom" between the swine flu shot and the onset of neurological symptoms. Dr. Poser agreed that fatigue was not necessarily a symptom of GBS but stated that in certain circumstances it could be. He believed in this case that plaintiff's fatigue in December and January was a manifestation of GBS because it was so extreme that it caused a significant change in plaintiff's daily habits and because it eventually led to neurological involvement. He believed the fatigue to be suggestive of muscle weakness. Dr. Poser credited plaintiff's testimony that she felt that something very serious was wrong with her and concluded that she was exhibiting a sub-clinical manifestation of her GBS.

It was further Dr. Poser's opinion that the symptoms that thereafter appeared and taken at the time by the doctors as flu, gastroenteritis or appendicitis, were simply the clinical manifestations of the demyelinating attack on the peripheral nervous system, which system includes the autonomic nervous system. Dr. Poser testified that in his experience GBS patients often have autonomic nervous system involvement. He stated that while the autonomic response ordinarily would be one of repression of the autonomic nervous system rather than over-activity of the autonomic nervous system, it is not unusual to see over activity of the type exhibited by plaintiff and which caused plaintiff's nausea, vomiting, and diarrhea.

Dr. Poser was of the opinion that plaintiff's symptoms on January 26, 1977 were symptoms of an autonomic nervous system involvement rather than symptoms of gastroenteritis for a number of reasons. The high white blood count noted in the hospital record indicated an elevation of a particular type of white cell known as a poly. Gastroenteritis is most often a viral illness which does not create an increase in polys, rather, the polys would decrease with gastroenteritis. Dr. Poser admitted that if plaintiff had suffered from a bacterial gastroenteritis there could be an increase in the number of polys but concluded from the hospital record that she did not suffer from a bacterial illness. He stated that a bacterial illness was very serious and that the record did not indicate that she had been as sick as he would expect her to be if she had a bacterial infection. Moreover, he stated if she had been so sick the doctors never would have performed an operation. Additionally, plaintiff exhibited signs of rebound tenderness and guarding. This is caused by muscles tensing to protect the abdomen. Dr. Poser stated that this is not an uncommon response to an acute condition such as GBS but that it would not be expected to occur with gastroenteritis. Further, if plaintiff had had gastroenteritis there would have been an infection or inflammation of the abdomen that would have revealed itself during surgery. He stated that the hospital record indicated that Dr. Licata had performed a thorough examination of the abdomen and found that it was normal. Finally, he stated that even though diarrhea was noted, the record also indicated she was constipated and that this was inconsistent with a finding of gastroenteritis.

Dr. Poser concluded that plaintiff's GBS had occurred within seven to nine weeks of the shot after being informed of the substance of plaintiff's testimony in this case. Prior to trial he had concluded that plaintiff's GBS arose within twelve to thirteen weeks after the shot, relying on the date when plaintiff's numbness and paralysis began to manifest itself. It is his theory that a person who has received a vaccine remains at risk as long as the body retains antibodies to that vaccine. Because persons have been shown to retain a high antibody to swine flu vaccine six months after the vaccination, he believes that there could be a causal connection of up to six months between the vaccination and onset

6

of the disease. It is his opinion that medical thinking in this area has been too restrictive and that physicians are now beginning to recognize that they had to look further in a patient's past to identify a causative factor. This is based on his observation that people respond differently to an antigen depending on that individual's particular immune system. He stated that it is unrealistic to presume that the disease process will manifest itself in the same time and manner in every person. Dr. Poser has published two articles in support of this theory which as yet have not been challenged. (Exs. 8, 10).

Therefore, even if plaintiff's symptoms in December and January were not symptoms of GBS, Dr. Poser still concluded, to a reasonable degree of medical certainty, that the swine flu shot received by plaintiff in October of 1976 caused her GBS. He stated that in his opinion the study performed by Dr. Schonberger for the CDC was being improperly used. He stated the study was important to indicate that there could be a causal relationship between a vaccine and an onset of disease for a longer period of time than previously thought, but that it should not be concluded from this study that there can be no causal relationship after eight weeks. He agreed that in most cases the symptoms would arise within eight weeks but stated this ignores the person whose symptoms take longer to develop. Dr. Poser also examined a chart prepared by Dr. Schonberger and noted it indicated an increase in the incidence of GBS twelve weeks after the shot. Even though Dr. Schonberger stated that he did not believe that this increase was statistically significant, Dr. Poser disagreed. Dr. Poser noted further that CDC set forth no reporting criteria when the study was conducted and that there is no way to tell whether there was overreporting or underreporting of incidents of GBS after the shot.

Dr. Poser testified further that in his opinion plaintiff's GBS could not have been caused by her surgery on January 26, 1977. He stated that he did not agree that surgery was a causative factor in the development of GBS, but even if it was, it was too close in time to the onset of severe symptoms to have caused the disease.

Dr. Terrence M. Phillips, director of the Immuno-Chemistry Laboratory and Associate Professor of Medicine at the George Washington University Medical Center in Washington, also testified on behalf of the plaintiff. Dr. Phillips received a sample of blood drawn from the plaintiff and a vial of the particular lot of Parke-Davis vaccine which had been injected into the plaintiff's arm. With this material, he performed certain standard immunological tests; they are indirect Immunofluorescence, Counter-Current Immunoelectrophoresis, and Enzyme-Linked Immunoassay. From the final tests, he produced lines of identity which he identified as demonstrating, to a greater than scientific certainty, to-wit, with an eighty (80%) percent accuracy, that there were antibodies in plaintiff's blood which reacted against human peripheral nerve tissue and against components of the swine flu vaccine. Dr. Phillips also had removed the lymphocytes from plaintiff's blood and through his testing, was able to conclude that a component of the vaccine was causally connected to the peripheral neuropathy suffered by the plaintiff. The peripheral neuropathy in this case was stipulated to be GBS.

Dr. Phillips acknowledged that he had carried his work beyond the standard tests for cross-reaction in an effort to identify the specific protein within the vaccine that contained the offending antigen. Previously he had identified that antigen to be P2 Protein. He acknowledged that he was not now pressing this scientific point in this case because it had become the subject of controversy, not only in the courts but also in the scientific community. He expressed the opinion that until he and Dr. Brostoff exchanged materials or Dr. Eylar and Dr. Brostoff exchanged materials and had them tested, he would withhold judgment on whether he, as he believed, had isolated the specific agent. His tests, however, as to the causal relationship between the vac-

cine and the plaintiff's disorder were not dependent upon the isolation of P2 Protein.

Dr. Steven Brostoff, Professor of Neurology and Basic and Clinic Immunology and Microbiology at the Medical University of South Carolina testified on behalf of the government. Dr. Brostoff is recognized as an authority on P2 and experimental allergic neuritis (EAN), the animal model for GBS in humans. Dr. Brostoff works with experimental animals in his immunological studies of demyelinating diseases. Dr. Brostoff testified that scientists have been able to produce an experimental demyelinating disease in animals with the use of P2 Protein and a booster injected into the animal. It is thought by Dr. Brostoff that the same result would occur if P2 Protein were injected into humans but he stated that the risk of such experiment is too extreme and, therefore, it has not been done.

Dr. Brostoff testified that in his experience neurological symptoms generally develop within four to five weeks after injection of P2 and that he has never seen development of neurological disease after thirteen weeks.

Dr. Brostoff also testified that he tested a number of samples of swine flu vaccine and that he was unable to find any P2 Protein in any of the samples. Dr. Brostoff stated that he uses a radio-immuno-assay (RIA) which he believes is the most sensitive test. Dr. Brostoff tested the vaccine given to plaintiff in this case and did not find any P2.

With regard to lines of identity identified by Dr. Phillips, Dr. Brostoff stated that even though the lines of identity appear to connect, the bands are wide and somewhat diffuse. He stated this could indicate several bands running together and overlapping rather than the single line of identity testified to by Dr. Phillips. Moreover, Dr. Brostoff stated that even assuming Dr. Phillips did find lines of identity, these lines do not prove that the swine flu vaccine caused a peripheral neuropathy. All they prove is that there is an antibody that recognizes both the peripheral nerve ex-

tract and the vaccine. He stated it would not be surprising to find antibodies to peripheral nerve in a person who suffered from GBS. A person also would have antibodies against any vaccine they were injected with.

The final expert witness was Dr. James Parker, a neurologist from Columbus, Ohio. Dr. Parker testified that it was his opinion, to a reasonable degree of medical certainty that the swine flu shot which plaintiff received on October 30, 1976 did not cause her GBS. It was his opinion that plaintiff suffered from gastroenteritis and that this was the cause of her GBS.

Dr. Parker testified that abdominal pain, vomiting, high white blood count and fatigue were not diagnostic of GBS but were consistent with the diagnosis of gastroenteritis. He testified that he had never seen a patient present autonomic symptoms or fatigue in the first stages of GBS. He stated it was his experience that the illness generally progresses to a state of paralysis within a few days after onset. He testified that plaintiff's complaints of fatigue in December were non-specific and had nothing to do with her subsequent GBS. Further, Dr. Parker noted that none of these complaints were found in any of the medical reports. He also stated that with GBS there more likely would be a repression of the autonomic nervous system rather than overactivity indicated by nausea and vomiting. He also stated that there can be an increase number of polys with a viral infection even though this is rare.

Dr. Parker relied primarily on the CDC study to conclude there was no causal relationship between the swine flu shot received by the plaintiff on October 30 and the GBS which Dr. Parker concluded occurred thirteen weeks later. He stated that there was no evidence to support Dr. Poser's theory that equates the protective effect of a vaccine with a continuing risk of developing GBS. He agrees that each person develops GBS in a different manner and that there is no set time in which the auto-immune disease may be activated. It was his belief, however, that no relation-

ship between the swine flu shot and the onset of GBS beyond an eight week period had ever been demonstrated.

Dr. Parker testified further that in his opinion the increase in the incidence of GBS in the twelfth week following vaccination was not statistically significant to show a causal relationship between vaccination and the onset of GBS at twelve weeks. Dr. Parker stated that this conclusion was supported by other epidemiological studies that were performed subsequent to the swine flu vaccination program which indicated a causal relationship of up to four to six weeks only.

Dr. Parker agreed with Drs. Poser and Chattha that the surgery likely was too close in time to have caused plaintiff's GBS.

Dr. Parker also stated that, assuming plaintiff's symptoms of GBS occurred in mid-December, he would conclude to a reasonable degree of medical certainty that the swine flu shot caused GBS. It was his opinion, however, that the symptoms of fatigue experienced by plaintiff in December were too vague and too far removed from the eventual onset of the paralysis in late January and early February to have a causal relationship.

## DISCUSSION

This case presented to the Court complicated factual issues not encountered in any of the swine flu cases we have previously considered. Both sides offered testimony from prominent and knowledgeable neurologists who disagreed on most issues. It is the Court's responsibility to listen to the evidence presented in this trial and make a determination on the question of whether the swine flu shot caused this plaintiff's GBS. After carefully considering all of the evidence the Court finds that plaintiff has carried her burden of proving by a preponderance of the evidence that the swine flu vaccination she received on October 30, 1976 was the proximate cause of her GBS.

GBS is an inflammatory disease of the myelin sheath of the peripheral nerve. The peripheral nerves are those which originate at the spinal cord and traverse the body, serving muscles and organs throughout the body. The peripheral nervous system includes the autonomic nervous system.

GBS is a disease which can only be diagnosed symptomalogically. Because there is no dispositive test which can be administered to determine whether a person has GBS, a physician can only look at the symptoms a patient is experiencing and exhibiting and decide whether those symptoms are consistent with a diagnosis of GBS. In June of 1978 the National Institute of Neurological and Communicable Disorders and Strokes (NINCDS) published a list of criteria for the diagnosis of GBS. These criteria have assisted physicians in recognizing GBS, but the criteria listed are not exhaustive. Because GBS is a syndrome it can manifest itself in many ways.

The cause of GBS is unknown. GBS has been associated with over one hundred antecedent events, including surgery and gastroenteritis and now the swine flu shot. No one knows what the connection is between such antecedent events and GBS; it is only known that, based on the temporal relationship between the two—i.e. the fact that there is a short and relatively predictable time interval between the event and the onset of GBS, there is some association between them.

An epidemiological study was conducted by the CDC from October 1, 1976 through January, 1977. Information was collected from doctors and hospitals all over the country but some states were excluded. Participation in the study was voluntary and there is no way to determine how many cases of GBS were not reported. Moreover, there was no reporting criteria established and there is no way of knowing how many cases were reported as GBS that were not in fact GBS.

Dr. Lawrence Schonberger, an epidemiologist, headed the CDC study. He concluded from the results of the study that there was an increased risk of GBS associated with the swine flu vaccine up to ten weeks after vaccination. Dr. Schonberger con-

cluded that after ten weeks the incidence of GBS returned to the "baseline rate", that is the rate at which GBS would be expected to occur naturally in the population absent the shot. The baseline rate was determined to be approximately .22 cases per million of population per week. This figure reflected the number of persons who were not vaccinated with the swine flu vaccine and who nevertheless contracted GBS, and whose cases were reported to the CDC.

The Schonberger study is proof, therefore, that there is a causal relationship between the swine flu vaccine and the occurrence of GBS in certain individuals at least within a period of ten weeks. Even though no one knows how or why, the medical experts all agree that the swine flu shot did in fact cause GBS.

We conclude from the evidence presented that plaintiff experienced symptoms of GBS within seven to nine weeks after receipt of the swine flu vaccine. More likely than not, the fatigue testified to by plaintiff was the result of muscle weakness which is a classic early symptom of GBS. After hearing plaintiff testify and observing her demeanor while on the witness stand, we find the plaintiff to be extremely credible in this regard. Even though she is an older woman and had suffered some fatigue in the past, the fatigue and weakness she suffered in December of 1976 and January of 1977 was clearly different than anything she had experienced before. It significantly altered her lifestyle and even though she continued to work she had to "push herself" and was not able to do anything else but sleep in the evenings. She felt weak and was afraid that something terrible was going to happen to her. We are not troubled by the fact that she did not report these symptoms to Dr. Ruksha or any other doctor at the time as they are significant only in retrospect. We do not think it unusual that a woman of her age, even considering the frequency with which she saw her doctor, would not go to her doctor with these types of complaints; the evidence does not support a conclusion that plaintiff ran to her doctor whenever she felt tired or ill.

Further, the fact that she did not advise the doctors upon admission to the hospital of her fatigue in December and January also does not convince us that she did not experience these symptoms. By the time she got to the hospital she was in extreme distress and not able to communicate well. Moreover, there is no evidence that anyone specifically asked her about how she had felt a month prior. Plaintiff is not a person who would be expected to know that this information would be relevant and cannot be, therefore, held accountable for her failure to relate it to the doctors. We believe that plaintiff was telling the truth and observe that if she had been trying to manufacture symptoms of GBS, she likely would have come up with something more precise than what she offered.

We rely primarily on the testimony of Dr. Poser for our conclusion that the fatigue and weakness that plaintiff experienced in December and January were symptoms of her GBS. Dr. Poser was of the opinion, to a reasonable degree of medical certainty, that the fatigue testified to by plaintiff was a "bridging symptom" of her GBS. Dr. Poser testified that he had observed similar responses in a number of his patients. This type of mild, sub-clinical beginning of GBS is well described in Dr. Poser's article entitled "Late-Onset of Guillain-Barre Syndrome". In that article Dr. Poser observes that a number of doctors have found abnormalities in the peripheral nerves of patients with GBS after complete functional recovery. It is Dr. Poser's opinion that the opposite also is true: pathological changes in the nerves can exist without symptoms prior to the development of acute GBS. Hence, the appearance of mild sub-clinical symptoms prior to the manifestation of severe symptoms.

Dr. Poser's opinion finds support in the work of Dr. Barry G.W. Arnason who has concluded that GBS may begin with mild distal weakness and progress at a slow tempo to quadriparesis. (*See* Arnason, "Inflammatory Polyradiculoneuropathies", Ex. J at 1135). Dr. Arnason found in the alter-

native that the GBS may progress for a time, become arrested or actually improve for a time and then resume its progressive course. Finally, the NINCDS criteria relied on by the government lists as a variant: "Progression beyond four weeks. Occasionally, a patient's disease will continue to progress for many weeks longer than four or the patient will have minor relapse."

We find that plaintiff's surgery was not the cause of her GBS. Not only do we conclude that her GBS arose prior to surgery, but even if it had not, all of the doctors agreed that the surgery occurred too close in time to the manifestation of severe neurological disorders to have caused plaintiff's GBS.

We find further that plaintiff did not suffer from a gastrointestinal infection in late January of 1977 but was experiencing an autonomic nervous system dysfunction related to her GBS. We were convinced by the testimony of Dr. Licata and Dr. Poser that the results of tests and examinations performed at the time of the operation were inconsistent with a diagnosis of gastroenteritis. We are especially impressed with the fact that no inflammation or infection was observed by Dr. Licata during his internal examination of plaintiff's abdomen. Further, the increase in the number of white blood cells with a shift to the left (polys) did not indicate a viral infection, and we are convinced by Dr. Poser's testimony that plaintiff was not sick enough to have had a bacterial infection. Further, the testimony of Drs. Licata and Poser was that rebound tenderness and guarding also are inconsistent with gastroenteritis. Dr. Parker's opinion that plaintiff did have gastroenteritis was based upon a review of the same medical records relied upon by Drs. Licata and Poser but we find that such opinion is not supported by the evidence in the record. The fact that Dr. Licata originally indicated in the hospital report that plaintiff had gastroenteritis does not significantly detract from his opinion rendered at trial that she did not have gastroenteritis at the time of surgery. It is not unusual in cases of GBS that early symptoms will be mistaken for something else and that only when the syndrome fully manifests itself can the doctors understand what was occurring in the early stages.

We find from the evidence, therefore, that the onset of plaintiff's GBS occurred seven to nine weeks after she received the swine flu vaccination. We conclude further that such vaccination was the proximate cause of plaintiff's GBS. This conclusion is supported by the CDC study which recognized a causal relationship up to ten weeks. It is further supported by the opinions of plaintiff's expert witnesses and the medical literature they relied upon. In addition, defendant's own expert witness, Dr. Parker, agreed that if plaintiff had symptoms of GBS in mid-December or early January, then the cause of her GBS likely would be the swine flu shot. Because we have found that she did in fact have symptoms of GBS in December and January, we conclude from this that the shot caused her GBS.

Moreover, even assuming that the fatigue experienced by plaintiff in December and January was not a symptom of her GBS, we would still conclude from the facts presented in this case, that the swine flu shot plaintiff received on October 30, 1976 was the proximate cause of her GBS.

We have already concluded that plaintiff did not have gastroenteritis in January of 1977, but was experiencing an autonomic nervous system dysfunction related to her GBS. Assuming therefore that the onset of plaintiff's GBS occurred in late January of 1977, the onset date would be within eleven to twelve weeks after receipt of the swine flu shot. The report prepared by Dr. Schonberger indicates there was an increased incidence of GBS following a swine flu shot at twelve weeks. Dr. Schonberger does not believe that the increased incidence shown at twelve weeks is statistically significant and the government therefore argues that it does not constitute proof of a causal relationship. We disagree for a number of reasons. Statistics is an inexact science and there always is

some error. There were known problems with reporting and it is more likely than not that the background rate figure arrived at by Dr. Schonberger was not exact or that some cases of GBS went unreported. *See Sulesky v. United States*, 545 F.Supp. 426 (S.D.W.Va.1982) (Dr. Schonberger found different background rate of GBS in unrelated study). To conclude, therefore, that the few cases of GBS that occurred twelve weeks after receipt of the shot are not sufficient in number to create a statistical significance ignores the fact that, statistics aside, there appears to be a relationship in those few cases. As stated by Dr. Poser, everyone responds to an event differently, depending on their personal make-up, and there always will be people who fall outside the norm. We recognize that in most cases symptoms of GBS arose, if at all, within six weeks after receipt of the vaccine, but that figure represents only the majority of cases. We find that because some increase in the incidence of GBS was shown at twelve weeks, no matter how small, that increase is significant in this case where there is no other identifiable cause of plaintiff's GBS. *See, Hockett v. United States of America*, Civil No. 79–4311 (S.D.Fla.1982).

This conclusion is further supported by the testimony of Dr. Chattha who stated that in his experience, it is not possible to set an absolute limit on the amount of time that may elapse between a causative event and a result. Rather, he believes that the cause and effect relationship gradually decreased over time and the fact that a person develops GBS after ten weeks does not necessarily rule out a causal relationship.

We, therefore, conclude that a causal relationship between plaintiff's GBS and the swine flu shot she received on October 30, 1976 has been demonstrated by the close temporal relationship between the shot and onset of GBS. A causal relationship also is demonstrated by the test results of Dr. Phillips. If we had nothing but Dr. Phillips' test results and none of these other factors we have identified as being indicative of causation, we might come to a different conclusion. We find, however, that Dr. Phillips' testimony and test results support all of the plaintiff's evidence of causation and indicate that more likely than not, the swine flu shot received by the plaintiff caused her GBS.

## CONCLUSIONS OF LAW

This Court has jurisdiction over this action pursuant to the National Swine Flu Immunization Act of 1976, 42 U.S.C. § 247b, and the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.*

The case is tried by the Court sitting without a jury, pursuant to 28 U.S.C. § 2402.

Plaintiff has the burden by a preponderance of the evidence that the swine flu shot she received on October 30, 1976 was the cause or a substantial cause of her GBS.

Ohio law provides that proof of proximate cause consists of proof that the original act produces a result which would not have otherwise taken place and does so in a natural and continuous sequence. *Strother v. Hutchinson*, 67 Ohio St.2d 282, 286–87, 423 N.E.2d 467 (1981).

The Court concludes that plaintiff Ermina D'Antonio met her burden of proving that the swine flu vaccine caused or substantially contributed to her GBS.

The final pretrial order of the United States District Court for the District of Columbia provides that where a person has developed GBS as a proximate result of the swine flu vaccination no theory of liability need be established in order to recover damages. Accordingly the only issue remaining before this Court is the question of damages.

A preliminary pretrial conference is scheduled for February 11, 1983 at 3:00 p.m. The conference will be by telephone and the attorneys need not be present in Cincinnati. Matters we will discuss include: setting of a discovery cut-off date; filing of proposed findings of fact and conclusions of law; possibility of settlement discussions with the transferor judge; and,

if the case cannot be settled, the setting of a trial date.

Defendant's motion to substitute trial exhibit (doc. 47) is hereby granted.

SO ORDERED.