Catherine **GRUBBS**, Plaintiff,

v.

**UNITED STATES of America,**
**Defendant.**

**No. S 80–323.**

United States District Court,
N.D. Indiana,
South Bend Division.

Feb. 29, 1984.

Lee Dabagia, Michigan City, Ind., Mark P. Friedlander, Jr., Arlington, Va., for plaintiff.

R. Lawrence Steele, U.S. Atty., Hammond, Ind. by Donald P. Moroz, Asst. U.S. Atty., South Bend, Ind., for defendant.

MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

I.

This case was tried before the court by very able counsel and the court uses this means of entering its findings of fact and conclusions of law.[1]

█ The stipulations of fact not in issue in the Final Pretrial Order applicable to all cases, show that the first knowledge of problems appeared in the second and third week of November 1976. (See Stipulations 217–226, MDL Docket 330, Exhibit 4, pg. 18, contained in the Final Pretrial Order *In Re Swine Flu Immunization Products Liability Litigation*.)[2] The moratorium on the Swine Flu Program was called on December 16, 1976, which arose out of the finding that the Guillain-Barre Syndrome was associated with the Swine Flu vaccination. (Stipulation of Facts 227 and 228.) The plaintiff, in this case, had received her vaccination only thirteen days before, on December 3, 1976.

Three weeks after the receipt of her Swine Flu shot, she began to show evidence of the first prodromal symptoms of the onset of this disease. When the disease process had progressed to the point of pain in the back, the plaintiff, although reluctant to go to a doctor, did, upon the urgings of her family and friends, go to a doctor who was unable to make a diagnosis, but began treating the plaintiff with Cortisone and muscle relaxants. The pain and the treatment continued over a number of months, with the Cortisone giving relief for a period of a week or so after each shot. It was reasonable for the plaintiff, having placed herself in the care of a physician, to follow his instructions and advice and believe that the medications being given would lead to a cure.

When the disease process worsened and the severity of the back pains intensified in

1. The National Influenza Program of 1976, Public Law 94–380, 42 U.S.C. § 247b (the Swine Flu Act) established the Federal Tort Claims Act as the means for asserting claims arising out of the swine flu program against the United States of America.

2. 464 F.Supp. 949 (D.D.C.1979).

April of 1977, she sought other medical advice and was placed in a hospital on May 9, 1977, for certain tests which led the doctor, Doctor Smith, to believe that the difficulties she was suffering would be relieved by a D & C operative procedure which was performed. This, too, did not lead to a resolution of the medical problem, and the plaintiff was referred to Doctor Keenan, a neurologist, who immediately was able to make the diagnosis of the Guillain-Barre Syndrome. There was no doubt in this diagnosis as all of the diagnoses that followed and all of the hospitalizations that followed over the next two year period, every doctor made the diagnosis of the Guillain-Barre Syndrome.

If the plaintiff's disorder was the Guillain-Barre Syndrome, then the plaintiff need prove no theory of liability in order to recover from the Government, pursuant to the Stipulation found in the Final Pretrial Order in the Multi-district Litigation. That Stipulation, which is directly applicable in this case, provides that if the court finds that the plaintiff has developed the Guillain-Barre Syndrome and that the Guillain-Barre Syndrome was caused by the Swine Flu vaccination, no theory of liability need be established by the plaintiff in order to recover damages. (See Stipulation and Final Pretrial Order, Paragraph IX.) Thus, in this case, the plaintiff must first establish that she suffered Guillain-Barre Syndrome caused by a Swine Flu vaccination, then the United States will stipulate that no theory of liability need be proven. The issue in this case is whether the plaintiff contracted the Guillain-Barre Syndrome and whether the Guillain-Barre Syndrome was caused by the vaccination.

This court specifically finds that the testimony of Catherine Grubbs concerning the onset of her disability and the history thereof to be highly credible. This court takes strong exception to counsel for the Government labeling it as "her inconsistent and incomplete evidence". Such may be within the limits of proper advocacy but it is absolutely contrary to this court's impression of the plaintiff as a witness.

To a large extent the United States of America and its chief witness are at war with issues that have already been decided in the Multi-district proceedings.

All of the doctors, both for the plaintiff and for the defendant, agree that the disease suffered by the plaintiff was chronic Guillain-Barre Syndrome. It is the position of the Government, however, that chronic Guillain-Barre Syndrome does, in fact, not really exist, but, rather, the disorder is known as chronic idiopathic polyradiculoneuropathy or CIP, and that CIP, essentially, is not the Guillain-Barre Syndrome. These are words, however, of form and not of substance. This is most clearly illustrated in Government's Exhibit Number 4, "Mayo Clinic Proceedings", dated November of 1975. The article entitled "Chronic Inflammatory Polyradiculoneuropathy", authored by, among others, Doctor Peter Dyck, discusses the diagnostic criteria for this neurological disorder. On page 634 of that exhibit and that article, Doctor Dyck wrote under "Discussions":

Since similar pathogenic mechanisms may be common to the acute and chronic varieties, the separation may be arbitrary, but it is clinically useful because the natural history is different and, indeed, the distinction is arbitrary.

Plaintiff's Exhibit Number 8, being MDL Document Number 103, is Chapter 56 from the textbook, *Peripheral Neuropathy*, edited by Doctor Peter Dyck. This particular chapter is authored by Doctor Barry G.W. Arnason and is entitled "Inflammatory Polyradiculoneuropathies". In this article, he points out on page 1135 that the illness may begin with a mild distal weakness and progress at a slow tempo to quadriparesis. Alternately, it may progress for a time, become arrested or improved for an interval, and then resume its progressive course. There, he is discussing chronic inflammatory polyradiculoneuropathy.

In the testimony he gave in Multi-District Litigation on June 25, 1979, in plaintiff's Exhibit Number 1, Doctor Arnason testified, at page 75, that it was his view that there is a chronic form of inflammatory

neuropathy which, in his opinion, is a variant of the Guillain-Barre Syndrome.

Doctors Hinman and McGee, in the article, "Guillain-Barre Syndrome with Slow Progressive Onset and Persistent Elevation of Spinal Fluid Protein", plaintiff's Exhibit Number 2, clearly stated that the "classification of Guillain-Barre Syndrome has been the subject of much discussion and review and they include those cases that could be considered chronic as opposed to acute." These type of cases were included in the article entitled "Recurrent and Chronic Relapsing Guillain-Barre Polyneuritis" by Doctor Thomas et al., being plaintiff's Exhibit Number 14.

Controlling in this matter, are the NINCDS notes, Multi-District Litigation Document Number 589, plaintiff's Exhibit Number 13, which is referred to in the Final Pretrial Order Stipulation which provides that:

In cases in which the United States contests that the illness alleged is, in fact, the Guillain-Barre Syndrome, it intends to rely upon the National Institute of Neurological and Communicative Diseases and Strokes Guidelines as working criteria.

Doctor Kincaid, who testified for the Government, acknowledged that the plaintiff met those diagnostic features which are required for a diagnosis of the Guillain-Barre Syndrome and that variants three and four, found at page 4 of that Exhibit, describe what Doctor Kincaid referred to as CIP and, therefore, if these standards were applied to Catherine Grubbs, she suffered Guillain-Barre Syndrome within the definition used in the Pretrial Stipulation. That being the case, there is no question that she suffered Guillain-Barre Syndrome, contemplated or recognized by the Government as being the disease for which they are liable if there is a causal relationship.

If the symptoms for the Guillain-Barre Syndrome began in late December of 1976, then the onset was within three weeks of the vaccination and would far more likely than not have been caused by the vaccine.

Plaintiff's Exhibit Number 10, Multi-District Litigation Document Number 121, is the epidemiologic study, "Guillain-Barre Syndrome Following Vaccination in the National Influenza Immunization Program, United States, 1976–77", by Dr. Lawrence Schoenberger, epidemiologist from the Center for Disease Control, and has often been referred to in the litigation as the "Schoenberger Study". The tables or charts shown on page 9 of the MDL Document and page 113 of the report show that the greatest period of relative risk was in the third week after the vaccination. As Doctor Shoenberger wrote on page 8 of the Multi-District Litigation Document"

"Based on the attack rated by week after vaccination in Figure 6, the relative risk of GBS (the ratio of attack rates in the vaccinated and unvaccinated populations) were determined (Figure 7). The peak relative risk, which exceeded 12, occurred in weeks two and three after vaccination, and prior to the tenth week after vaccination, all relative risks were significantly greater than one."

The statistical likelihood that the vaccine caused GBS in the Plaintiff here was 93.5 percent, accepting that the symptoms occurred in the third week following vaccination.

Doctor Langmuir testified (Multi-District Litigation on July 20, 1979, Plaintiff's Exhibit Number 3, p. 23):

"Q As of January, 1977, when you did this data and analyzed it, what opinion did you hold as to the relationship between the appearance of Guillain-Barre Syndrome in Swine Flu vaccinees, and the fact that they had been given the Swine Flu vaccine?

A I was quite persuaded by that time that this was a causal relationship.

Q Dr. Langmuir, using a term that lawyers sometimes use, 'Reasonable medical certainty', do you hold that opinion of the causal relationship to a reasonable degree of medical certainty?

A I would go stronger than that and say that there is no doubt in my mind that there is a clear relationship of ap-

proximately 90 percent of the cases of Guillain-Barre disease that occurred in October, November, December, a few in January, following the administration of the Swine Flu vaccine. Approximately 90 percent were caused by the vaccine."

Doctor Justin Keenan, the treating physician who made the original diagnosis, has testified that, in his opinion, the Guillain-Barre Syndrome suffered by Catherine Grubbs was caused by the Swine Flu vaccination and he expressed this opinion with a reasonable degree of medical certainty.

Doctor John Kincaid, the neurologist who testified on behalf of the Government, stated that if he accepted the word of Catherine Grubbs that the symptoms began in late December of 1976, it would be a reasonable medical conclusion that her neurological illness was related to the Swine Flu vaccination.

The Government does not challenge the fact that Catherine Grubbs suffered the symptoms of weakness, tiredness and back pain in December of 1976 and January of 1977. Their view, however, is that those pains and that weakness were a different disease and not connected to the events that occurred in April. Not only is this illogical, but considering the fact that Catherine Grubbs went to a doctor in January of 1977, received treatment for this disorder which did not cure it, and that again when she went to Doctor LeRoy A. Smith in April of 1977 and a D & C was performed by Doctor Bienvenido Ticksay that did not cure the disorder, this would lead to the clear inference that these were part of the prodromal neurological symptoms of the Guillain-Barre Syndrome which was not diagnosed until May of 1977 and all part of the same disease as contrasted to being a separate disease. The Government offers no evidence of the fact that it was a different or separate disease.

Doctor Frank Kubik, without having made a correct diagnosis, treated Mrs. Grubbs with Cortisone, and that during the course of his several treatments, she felt relief but then when the pain increased in intensity and she was finally admitted to the hospital in the care of Dr. Keenan, he found that Cortisone did not help the patient. This course of events is consistent with the case history reported by Doctor Dyck and cited in the article, "Recurrent and Chronic Relapsing Guillain-Barre Polyneuritis", by Dr. Thomas and others, Plaintiff's Exhibit Number 14, where on Page 590 it is written:

"Dyck, et al. (1968) have also recently reported two cases of chronic relapsing sensorimotor neuropathy with raised cerebrospinal fluid protein levels, both of which were initially diagnosed as the Guillain-Barre Syndrome. In cases with small numbers of relapses, it may be difficult to distinguish between spontaneous and drug-induced fluctuations. In one of the patients reported by Dyck, et al., cortocosteroid treatment coincided with improvement, with relapse on stopping it, but further treatment failed to lead to improvement."

The causal time span in this case is *much* closer than that found in *Alvarez v. U.S.*, 495 F.Supp. 1188 (D.Colo.1980). The Government's reliance thereon is misplaced. The same basic deficiency exists as to the long list of cases cited by the Government at page 16 of its post-trial brief. There and in subsequent pages thereof the Government attempts to label this a "long onset G.B.S. case." The evidence clearly demonstrates that it is not such a case. The personal and medical evidence which this court heard and saw clearly demonstrates that this is an early onset case which was not early detected by the plaintiff's family doctor.

## II.

The law and the evidence are both with the plaintiff. She is entitled to recover damages.

Generally, a determination of damages in the State of Indiana requires an evaluation of the following elements:

1. Reasonable and Necessary Medical, Hospital, Nursing and Related Expense.

2. Nature, Extent and Permanency of the Injury as the Same Affects the Quality and Enjoyment of Life.

3. Loss of Earnings.

4. Impairment of Earning Capacity.

5. Physical Pain and Suffering, Past and Future.

6. Mental Pain, Suffering and Anguish, Past and Future.

7. Disfigurement or Deformity.

### A.

The parties have stipulated that a reasonable sum for nursing and housekeeping services, including transportation, is One Hundred Thousand Dollars ($100,000.00), and that the anticipated cost of special orthopedic shoes for plaintiff is in the sum of Two Thousand Six Hundred Forty Dollars ($2,640.00). The period of time covered by the nursing services is fourteen years, representing plaintiff's present age of 51 to 65. The cost of special orthopedic shoes in the sum of Two Thousand Six Hundred Forty Dollars ($2,640.00) is calculated for a period of plaintiff's estimated life expectancy from the date of trial, which is 25 years. The right of plaintiff to recover the reasonable and fair value of the above expenses is unquestioned in the State of Indiana. *Brosnan v. Sweetser*, 127 Ind. 1, 26 N.E. 555 (1891); *Herrick v. Sayler*, 160 F.Supp. 25 (D.D.Ind.1958).

### B.

■ The assessment of the nature and extent of injuries and of the permanency of the injuries are separate and distinct elements of damages from the determination of lost earning capacity or pain and suffering of the injured party. The law recognizes that an individual is entitled to be compensated for the loss of use or the loss of function of a part of the body irrespective of the relationship of that loss to other elements of damages. The individual is entitled to the full function of his body, and any loss of function or disability is in itself compensable because of the effect upon the quality and enjoyment of life which would

not have been impaired but for the injury. *New York, C. & St. L.R. Co. v. Henderson*, 237 Ind. 456, 146 N.E.2d 531 (1958), *reh. denied*, 237 Ind. 456, 147 N.E.2d 237; *Leader v. Bowley*, 132 Ind.App. 528, 178 N.E.2d 445 (1961).

### C.

■ An injured party is entitled to collect for any loss of earnings both to the date of trial and in the future. *Stauffer v. Lothamer*, Ind.App., 419 N.E.2d 203 (1981). The parties have stipulated that plaintiff has a loss of income, both past and future, in the sum of Two Hundred Eighteen Thousand Dollars ($218,000.00) which, therefore, determines the value of the time lost from employment. *Bowdoin v. Chicago Express, Inc.*, 125 F.Supp. 341 (N.D.Ind.1954).

### D.

Indiana clearly recognizes the impairment of an individual's earning capacity as a proper element of damages and as separate and distinct from loss of earnings. *Barker v. Cole*, Ind.App., 396 N.E.2d 964 (1980); *Duchane v. Johnson*, Ind.App., 400 N.E.2d 193 (1980); *Scott v. Nabours*, 156 Ind.App. 317, 296 N.E.2d 438 (1973). Impairment of earning capacity as distinguished from lost earning or wages is the impairment of one's ability to engage in a chosen vocation as distinguished from loss of earnings. Therefore, one is entitled to recover for damages resulting from an injury which causes a career change or, in effect, "closes the door" to a preferred or desired field of employment. See *Duchane, supra*. In this case, Catherine Grubbs, who enjoyed her chosen vocation working with the public as a waitress and bartender, has been deprived not only of loss of time and earnings, but the enjoyment of employment and the earning capacity she formerly held.

### E.

■ Recovery for physical pain and suffering embraces every description and the complete rule allows recovery for every form of distress, which is the natural and

direct result of a physical injury. *Boston v. Chesapeake & Ohio Railway, Company*, 223 Ind. 425, 61 N.E.2d 326 (1945). Physical pain and suffering, past, present, and future, once established, is compensable without offering specific evidence as to the monetary value. *Johnson v. Mills*, 157 Ind.App. 620, 301 N.E.2d 205 (1973); *Mays v. Welsh*, 218 Ind. 356, 32 N.E.2d 701 (1941).

### F.

 Most of the case law distinguishing between physical pain and suffering also can be cited in support of compensation awarded for mental pain and suffering caused by said injuries. See cases cited above and also *Indiana Motorcycle Association v. Hudson*, Ind.App., 399 N.E.2d 775 (1980); *Charlie Stewart Oldsmobile, Inc. v. Smith*, 171 Ind.App. 315, 357 N.E.2d 247 (1976), which allows recovery for mental pain and suffering attributable to the accident which flows directly and naturally from the physical injury. Mental pain, anguish and suffering, therefore, like physical pain and suffering, is compensable without offering specific evidence as to the monetary value. See *Johnson v. Mills, supra*. Mental anxiety as well as mental anguish, both of which constitute mental suffering naturally resulting from personal injuries, may be considered in estimating damages. *Plummer v. Hollis*, 213 Ind. 43, 11 N.E.2d 140 (1937); see 3 Notre Dame L. 246 (1928), Mental Anguish as Element of Damages; see also, 54 Ind.Law J. 467 (1979).

### G.

 In an appropriate case, the court may award damages for disfigurement or deformity resulting from the injuries sustained. Ind.Pat. Jury Instructions § 901(g); *Harrod v. Bisson*, 48 Ind.App. 549, 560, 93 N.E. 1093 (1911). An award to Catherine Grubbs on the basis of disfigurement or deformity is proper in view of her distorted hands and fingers as well as the severe atrophy of the lower legs, all of which is readily apparent. See also, *New York, C & St. L.R.R. v. Henderson, supra*, (disfigurement of hand); *Public Utilities Co. v. Handorf*, 185 Ind. 254, 112 N.E. 775 (1916) (face and lower jaw paralyzed).

This memorandum is intended to fully comply with Rule 52, F.R.C.P.

### JUDGMENT

Judgment shall enter in favor of the plaintiff, Catherine Grubbs, and against the United States of America, for the following amount:

| | | |
|---|---|---:|
| 1. | Lost income | $218,400.00 |
| 2. | Special orthopedic shoes, future | 2,640.00 |
| 3. | Special nursing care, future | 100,000.00 |
| 4. | Past and future pain and suffering, disfigurement, loss of earning capacity, permanent loss of body functions | 400,000.00 |
| | | $ 721,040.00 |

Costs are assessed against the defendant.