**Carol STORRER, et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. C 79–354.**

United States District Court, N.D. Ohio, W.D.

Sept. 4, 1986.

---

**3.** Jx-S at 2.

David P. Rupp, Jr. Rice, Plassman, Rupp & Hensal, Archbold, Ohio, for plaintiffs.

Asst. U.S. Atty., Toledo, Ohio, for defendant.

## FINDINGS OF FACT and CONCLUSIONS OF LAW

WALINSKI, Senior District Judge.

This action was filed in the United States District Court for the Northern District of Ohio, Western Division, on June 22, 1979, under the provisions of the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, and the National Influenza Immunization Program, 42 U.S.C. § 257(b). Plaintiffs seek damages from defendant for injuries allegedly incurred by Carol Storrer as a result of her receipt of a Swine Flu vaccination on November 30, 1976.

On July 31, 1979 this action was transferred to the United States District Court for the District of Columbia for consolidated proceedings in *In Re Swine Flu Products Liability Litigation*, M.D.L. No. 330, Misc. No. 78–0040 (D.D.C.1979). The action was remanded for further proceedings in this Court on June 13, 1980. A bench trial on the issue of liability was held beginning on November 1, 1984 and concluding on November 15, 1984. The Court has fully considered the evidence and arguments of the parties and files this opinion which incorporates the Court's Findings of Fact and Conclusions of Law. For the reasons which follow the Court finds that plaintiffs have proved, by a preponderance of the evidence, that they are entitled to recover damages against defendant in this case.

## BACKGROUND

The National Swine Flu Immunization Program of 1976 was an attempt by the federal government to inoculate the adult population of the United States against the perceived threat of a Swine Flu epidemic. The program was commenced on October 1, 1976, and suspended by December 16, 1976. The historical beginnings of this inoculation effort and the genesis of the Swine Flu program have been discussed at length by other courts. *See, Hunt v. United States*, 636 F.2d 580, 589–593 (D.C.Cir.1980).

Carol Storrer was employed as a home economics teacher in the Archbold Area Schools at the time she received her swine flu vaccination on November 30, 1976. In addition to her teaching duties she was involved in numerous extra curricular activities including matmaids and being a cheerleading advisor. She was active on her church council as well.

Largely because of Carol's exposure to many children and in view of all the publicity and urging by President Ford, Carol left school early on November 30, 1976 and traveled to Napoleon, Ohio to be vaccinated.

Beginning just prior to Christmas of 1976 Carol began experiencing subtle changes. She recalled having to ask her students to carry groceries for her which she had bought for one of her cooking classes. Sometime during Christmas week she dropped a glass lid while washing dishes at a family gathering. In addition, Carol felt unusually cold and sometimes numb. As a result of the fatigue she experienced, she viewed her extracurricular activities as a drain.

During 1977 Carol continued to experience similar symptoms. In January she had difficulty walking through the snow to her house and it became tiresome to participate in bowling. In February Carol woke up in the middle of the night on several occasions feeling strange, as if her arms and legs were "asleep." In March, Carol found it difficult to pick up straight pins from the floor of her sewing classroom. While playing softball in the spring Carol had trouble gripping the bat and ball. She also noticed that she was having difficulty turning the car key and pushing the button to open her car door.

On June 18, 1977, Carol married Tom Storrer in Archbold, Ohio. While dancing at the reception following the wedding, Carol found it hard to hold on to her partner. Although Tom and Carol went on a honeymoon, their trip was cut short because Carol was so fatigued. After they returned home Carol could not even carry a watermelon from the store without assistance.

Ultimately, on June 27, 1977, Carol was hospitalized at Fulton County Hospital with progressive paralysis. By August 13, 1977, Carol's condition had improved to permit discharge without medication. Carol's next hospitalization occurred on November 15, 1977 when she was admitted to St. Vincent's Hospital in Toledo, Ohio. Her chief complaint was increasing weakness.

While at St. Vincent's, Carol's condition worsened to the point that she required a tracheostomy. Carol was discharged from St. Vincent's and transferred to Green Springs Rehabilitation Center on June 5, 1978. On September 14, 1978, Carol was discharged from Green Springs and readmitted to St. Vincent's due to her deteriorating condition. She was discharged from St. Vincent's on November 7, 1978. Carol remained at home for over a year. In June of 1979 Carol became pregnant. Her next hospitalization was in January of 1980 and she eventually had a cesarean section delivery of her child on February 6, 1980.

In March of 1980, Carol went home somewhat improved, but in July she again got worse and was admitted to Johns Hopkins Hospital in Baltimore, Maryland from August 3, 1980 to August 31, 1980. She was treated with plasma phoresis and returned home. In September of 1980, Carol was rehospitalized for further plasma phoresis treatments. Carol once again improved and went home, but in the later part of 1980, she became worse and went to the University of Michigan at Ann Arbor, Michigan for further plasma phoresis treatments. Carol returned home, but had to be rehospitalized on several occasions in the early part of 1981 for plasma exchange.

As of the time of trial Carol remained in a weakened condition. Although she was able to walk around the courtroom without assistance, she reports that she is unable to run, has trouble walking on her heels and cannot tap her feet.

Guillain Barre Syndrome (hereinafter "GBS") is a rare neurologic disorder. The condition was first described in 1859 by Dr. Landry as a disease of young French soldiers characterized by symmetrical weakness, elevated protein in the cerebrospinal fluid, and loss of reflexes. Dr. Landry considered it a fairly benign disease from which the patient always recovered. It was again described in 1916 by Doctors Guillain, Barre, and Strohl. In modern medicine, GBS is described as a neurologic disorder, inflammatory in nature, which affects the peripheral, as opposed to the central nervous system.

Pursuant to the final pretrial order entered by the Honorable Gerhard A. Gesell in the consolidated pretrial proceedings, if it is stipulated or otherwise determined that a plaintiff has developed GBS following a Swine Flu vaccination, no specific theory of liability need be established in order to recover money damages. Plaintiff need only prove a causal relationship between the vaccination and the onset of GBS. *See,* Stipulation and Final Pretrial Order, ¶ IX, *In Re Swine Flu Immunization Products Liability Litigation,* MDL No. 330, Misc. No. 78–0040 (D.D.C.1979). In this case the government does not stipulate that the disorder in question was GBS. Thus, the Court's initial task is to determine whether Carol Storrer's illness was indeed GBS, as claimed by plaintiffs, or some other neurological disorder as submitted by defendant.

## IDENTIFICATION OF PLAINTIFF'S DISORDER

In the wake of the mass inoculation for swine flu and the subsequent occurrence of more than a thousand GBS cases in the United States, a committee was formed by the National Institute of Neurological and Communicative Disorders and Strokes (NINCDS) together with the American Academy of Neurology and the American Neurological Association. This committee, composed of four eminent neurologists, conducted an extensive survey of clinical neurologists and achieved a consensus on a set of criteria that have since become known as the NINCDS criteria for GBS, and reflect the consensus of opinion on the diagnostic features of GBS. *Hixenbaugh v. United States,* 506 F.Supp. 461, 464–65 (N.D.Ohio 1980). *See also, Saxe v. United States,* 577 F.Supp. 135 (N.D.Ohio 1980). According to the NINCDS criteria for GBS, the clinical hallmarks of the syndrome are progressive motor weakness of more than one limb and areflexia (loss of deep tendon reflexes). Variants indicative of a different disease process include fever at the onset of neuritic symptoms, severe sensory loss with pain, progression of the disease beyond four weeks, cessation of progression without recovery or with major residual deficit remaining, and central nervous system involvement.

Carol's own description of her symptoms, as well the opinions of the medical experts called by plaintiffs would lead the Court to conclude that Carol's disorder was, indeed, GBS. Defendant's experts, of course, offered a conflicting viewpoint. Specifically, defendant claimed that Carol was suffering from chronic inflammatory demyelinating polyradiculoneuropathy (CIDP), which defendant claims is a separate disease entity from acute inflammatory polyradiculoneuropathy (GBS).

To support the contention that Carol was suffering from CIDP, defendant presented the testimony of two eminent clinical neurologists, Dr. Peter J. Dyck and Dr. Raymond D. Adams. Dr. Dyck, who is a Professor of Neurology at the Mayo Clinic Medical School, testified that historically, CIDP has been known, *inter alia,* as chronic relapsing polyneuritis, chronic GBS, relapsing GBS and chronic demylinative polyneuritis. After a three day examination and extensive testing of Carol, Dr. Dyck determined that Carol contracted CIDP and that in his opinion CIDP is a separate and distinct disorder from GBS. Similarly, Dr. Adams, who is a Senior Consultant in Neurology at the Massachusetts General Hospital in Boston, testified by videotape that Carol contracted chronic relapsing polyneuritis and that CIDP and GBS are distinct disorders. Among the reasons Dr. Adams gave for separating the two disorders are history, course, and response to corticosteroid treatment.

Defendant also presented the testimony of Dr. John Crossen, a pathologist and immunologist at the Minnesota Hennepin County Medical Center, and Dr. Arthur Asbury, a neurologist. The testimony of each of these experts supported defendant's claim that CIDP and GBS are two distinct disorders. In his deposition testimony offered in the Swine Flu case of *Styer v. United States,* No. 79–3489 (E.D.Pa.), Dr. Asbury explained that the differences between GBS and CIDP are expressed in temporal evolution, outcome or prognosis, and association of preceding events.

Plaintiffs argued that most of the differences between GBS and CIDP which were discussed by defendant's experts, were insignificant or simply reflected that the disease process goes on longer in chronic cases. Plaintiffs argued further that although GBS is typically an acute or subacute illness, the chronic form is well recognized in the medical literature. Plaintiff's expert, Dr. Peter Lichtenfeld, described the considerable variability of the GBS. He explained that some patients have relapsing courses, some cases involve recurrent episodes of the disease, and some cases have more chronic or slowly progressive onset of the illness.

After reviewing the evidence presented on this issue the Court is not convinced that a dividing line need be drawn between CIPD and GBS for the purpose of identifying Carol Storrer's illness. The Court concedes that GBS is typically an acute or subacute illness in which the disease peaks about one month after the onset of symptoms. There is, however, a long list of cases in which it is recognized that GBS may also take a more chronic form and may peak many months after the onset of the original symptoms. *See, e.g., Barnes v. U.S.A.*, 525 F.Supp. 1065 (M.D.Ala.1981); *Grubbs v. U.S.A.*, 581 F.Supp. 536 (N.D.Ind.1984); *Dillard v. U.S.A.*, No. CV 479–17 (S.D.Ga. October 30, 1981); *D'Antonio v. U.S.A.*, 626 F.Supp. 1 (S.D.Ohio 1983); *Vesperman v. U.S.A.*, No. B–80–662 (D.C.Md. June 20, 1983).

Accordingly, after careful review of the NINCDS criteria, the expert testimony presented by both defendant and plaintiffs, and the testimony of the plaintiff, herself, the Court concludes that Carol Storrer did, in fact, contract GBS.

## CAUSATION

■ As noted earlier, where it has been determined that plaintiff has developed GBS following a swine flu vaccination, no specific theory of liability need be established in order to recover money damages, plaintiff need only prove a causal relationship between the vaccination and the onset of GBS. *See* Stipulation and Final Pretrial Order, ¶ IX, *In Re Swine Flu Immunization Products Liability Litigation*, MDL No. 330, Misc. No. 78–0040 (D.D.C.1979). This being a Federal Tort Claims Act case, the Court must look to the law of the State of Ohio with regard to causation. Ohio law provides that proof of proximate cause consists of proof that the original act produces a result which would not have otherwise taken place and does so in a natural and continuous sequence. *Strother v. Hutchinson*, 67 Ohio St.2d 282, 286, 423 N.E.2d 467 (1981).

Shortly after the initiation of the swine flu immunization program, the Center for Disease Control (CDC) began a surveillance program to determine whether there was a statistical relationship between the swine flu vaccination and GBS. Preliminary data indicated that such a relationship existed and a moratorium on vaccinations was declared.

The surveillance program was headed by Dr. Lawrence Schonberger, a CDC epidemiologist. His final published report was introduced as defendant's exhibit NN. The study compared the attack rates in the vaccinated versus unvaccinated populations and various experts interpreting the figure have reached slightly different conclusions. The Court accepts the validity of the study and finds that it shows that where neurological symptoms develop within eight weeks or less of the vaccination, and these neurological symptoms are shown to develop into GBS, a statistical causal relationship has been established.

The Court notes that the data used in preparing these statistics refer to "onset of neurological symptoms", not the date of diagnosis or date of maximum illness. According to the testimony of Carol Storrer, she experienced numerous symptoms within eight weeks of the vaccination which was on November 30, 1976. Beginning just prior to Christmas, 1976, she began experiencing subtle changes. She had to ask her students for help in carrying groceries, she dropped a glass lid while washing dishes at a family gathering, and she felt unusually cold and sometimes numb. During January, Carol recalled feeling un-

usually fatigued and she had difficulty walking through the snow to her house. These symptoms were all reported within eight weeks of her vaccination. By February, Carol was waking up in the middle of the night feeling as if her arms and legs were asleep. Her symptoms increased and by June of 1977 Carol was hospitalized with progressive paralysis.

While defendant made much of the fact that many of the hospital records and the medical histories recorded by Carol's doctors reflected onset of symptoms in June, Carol's own testimony reflected a much earlier onset. After hearing her testimony and observing her demeanor throughout the trial, the Court finds Carol Storrer to be an exceptionally credible witness and accordingly, the most reliable source of information as to her own symptoms. The fact that Carol did not advise her doctors of her symptoms earlier does not convince the Court that she did not experience them. The Court finds that a credible explanation for her failure to report her symptoms as significant was that she did not realize that they were relevant. She may have attributed her symptoms to wedding jitters or a suspicion that she was pregnant.

In light of the Court's finding that Carol Storrer experienced the first symptoms of GBS within eight weeks of her swine flu vaccination is is unnecessary to comment on the testimony of plaintiff's expert, Dr. Goldfield, who reported increased likelihood of GBS for up to 26 weeks of the swine flu vaccination.

In summary, the Court finds that Carol Storrer began experiencing neurological symptoms in December of 1977. By June of 1977, Carol's illness progressed to an acute stage of a syndrome which the Court identifies as GBS in accordance with the medical testimony and the NINCDS criteria. Based upon the statistical evidence reported in the widely accepted Schoneberger Study, the Court finds that the most likely cause of the GBS was the swine flu vaccination which Carol Storrer received on November 30, 1977. Accordingly, plaintiffs have proved by a preponderance of the evidence, that they are entitled to recover damages against defendant in this case.

It is therefore,

ORDERED that judgment is granted for plaintiffs on the issue of liability.

FURTHER ORDERED that this cause is set for hearing on the issue of damages on NOVEMBER 25, 1986 at 9:00 A.M.