**Richard C. BAKER, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. B–79–396.**

United States District Court, D. Connecticut.

April 30, 1987.

George J. Jaser, Andrew Apicella, Milford, Conn., Clifford J. Shoemaker, Vienna, Va., for plaintiff.

Barry Stevens, Bridgeport, Conn., Asst. U.S. Atty., Laura D. Millman, Trial Atty., Torts Branch, Civil Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM OF DECISION

EGINTON, District Judge.

### INTRODUCTION

Plaintiff instituted this civil action pursuant to the National Influenza Immunization Program of 1976 (Swine Flu Act), Public Law 94–380, 42 U.S.C. 247b(j)–(*l*), as amended (1976), and the Federal Tort Claims Act (FTCA), 28 U.S.C. 1346(b), 2671 *et seq.*

The genesis of this litigation arose in 1918 in the United States, when an influenza epidemic resulted in approximately 500,-000 deaths. No virus was isolated from the 1918 influenza epidemic because procedures for growing influenza virus in a laboratory host were not developed until the 1930's.

In the winter of 1975–76, two events combined to launch the most extensive government immunization program in history. An epidemic of A/Victoria influenza resulted in approximately 20,000 excess deaths in the United States for the spring months of 1976. During the course of that epidemic, a number of cases of respiratory diseases at the United States Army post at Fort Dix, New Jersey were investigated and disclosed the presence of a swine-like virus designated type A/New Jersey/76. Although only five Fort Dix cases, including one death, revealed isolation of the swine flu virus, the government noted that a swine flu epidemic was a possibility. Accordingly, during the early months of 1976 the swine flu program was developed and announced by President Gerald Ford on March 24, 1976. The President stated that Congress would be requested to appropriate sufficient money so that every individual in the United States might be vaccinated against swine flu. The program was inaugurated (appropriately) on April 15, the day on which 1975 Income Tax Returns were due to be filed.

The government licensed four drug companies to manufacture swine flu vaccine: Richardson-Merrell, Inc.; Merck, Sharpe & Dohme; Wyeth Laboratories Division of American Home Products Corporation; and Parke, Davis & Co. a subsidiary of Warner Lambert Company. Vaccination trials involving approximately 7,500 recipients were conducted during the late summer and early fall of 1976. Swine flu inoculations were commenced on October 1, 1976 and continued for two and a half months

until the program was terminated on December 16, 1976 after approximately 42 million doses had been administered to the American public.

The suspension of the program in December was caused by a noticeable onset of Guillain-Barre Syndrome (GBS) in recipients of the vaccine. The onset of GBS showed a pronounced peak occurring some two to three weeks after the vaccination, strongly suggesting a causal association. However, it is significant that GBS is a syndrome. A syndrome is not in itself a specific disease. A syndrome, instead, is a group of symptoms that together are characteristic of a specific disease. Accordingly, a medical expert seeking evidence of the existence of GBS looks for the following criteria: bilateral muscle weakness of the lower motor neuron type with or without cranial nerve or sensory abnormalities, since the disease attacks the peripheral nervous system rather than the central nervous system, elevated protein in the cerebro spinal fluid, and loss of reflexes. Such are the standard signs of acute or sub-acute GBS.

Civil litigation claiming that the onset of GBS was caused by a swine flu inoculation flooded courts throughout the United States. In February, 1978, all of the federal actions then outstanding were consolidated by the Judicial Panel on Multidistrict litigation (JPML) and referred to the Honorable Gerhard A. Gesell of the District Court for the District of Columbia. Judge Gesell supervised extensive discovery procedures over a period of slightly more than a year and a half, with a remand order to the transferring courts being entered on November 15, 1979. As a result of the JPML proceedings, stipulations provided that if a particular plaintiff did in fact develop GBS at any time, the trial court will have to determine (without a jury) whether the GBS was in fact caused by administration of the vaccine, but it would not be necessary for any plaintiff to prove a particular theory of liability. The only liability issue is causation, which is the issue for this court now to determine.

Since the instant case was filed in the District of Connecticut just as Judge Gesell was terminating his JPML proceedings, the case was categorized as a "tag along" action and thereby it became subject to all of the stipulations and discovery that had been accomplished in the consolidated proceedings. JPML documents have been entered as exhibits in the trial of the case before this court.

The court sat for five days, hearing both fact and expert witnesses and receiving additional exhibits. The parties filed trial briefs in advance of the hearings, and submitted draft findings and conclusions at the close of the hearings.

The case is now ripe for determination and the court herewith issues its findings and conclusions in accordance with Fed.R. Civ.P. 52(a).

## CONTENTIONS OF THE PARTIES

The parties agree that the plaintiff received a swine flu vaccination on November 30, 1976 at his place of employment. Plaintiff contends that his first symptoms appeared within a week or two thereafter, when for no apparent reason he fell. Such falling episodes were repeated twice more in December. He was observed by others constantly rubbing his legs. Plaintiff further claims that he noticeably "slowed down" in the next few months, tired easily and went to bed early. He complained of pain in his back and legs and had difficulty with some of his movements. Plaintiff claims that he developed numbness and finally developed such acute symptoms in June of 1977 that he was examined twice at the emergency room of the Milford Hospital before finally being admitted on June 18, 1977, where, after a spinal tap discovered elevated protein levels, GBS was diagnosed.

The government in its trial brief claimed that, if indeed the plaintiff suffered any of the symptoms he claimed to have experienced in the period immediately following the inoculation and up to the time of hospitalization, such symptoms were caused either singly or in combination by his history of diabetes, his condition of obesity, or his

habits with respect to indulgence of alcohol and tobacco. More significantly, the government claimed in its trial brief (p. 4) that his acute GBS as of June 18, 1977 was one of the typical cases causally related to a viral illness which the government maintained the plaintiff had experienced just a few days before the acute GBS diagnosis was made. The government based that contention on the deposition of the plaintiff's treating physician, Dr. Robert Malone, whose testimony was not expected to be offered during the trial.

## DISCUSSION

In reaching its ultimate decision in this case, no easy process, the court is strongly influenced by the testimony of the fact witnesses, as distinct from the experts, which witnesses the court found to be credible individuals. The court has in mind that this is not a criminal case wherein the plaintiff would have to prevail by a standard of beyond a reasonable doubt. There is much doubt in this case and the plaintiff could not possibly have surmounted such a standard. However in this civil case all that plaintiff need do is to tip the scales of justice ever so slightly by a preponderance of the credible evidence.

The court is mindful that it does not write on a clean slate; indeed the four walls of the courtroom were covered with graffiti, much of it conflicting. The court was disturbed by the voluminous filings of the parties, which included the text of every prior decision by a U.S. District Judge, ruling on the precise question facing this court in one of the final decisions that will be rendered in a swine flu case. The court estimates from statistics offered by the parties that there were some 365 cases returned for trial from the JPML that could not be disposed of by voluntary dismissal or by settlement. Of those cases, only a handful are still pending. Of the cases in which judgment has been rendered, only about 15% of the courts found in favor of the plaintiff; the government prevailed in an overwhelming number of the cases. Some of those cases presented unique circumstances rendering the judicial determination readily distinguishable. Un-

fortunately, however, many decisions clearly find the federal bench sharply divided on the primary question of whether the GBS caused by the swine flu inoculations must be limited to the acute or sub-acute syndrome and whether cases of so-called chronic inflamatory polyneuropathy (CIP) present an entirely separate disease which no reputable study represents to be caused by the swine flu vaccine. In attempting to resolve this vital issue, the various district courts have all too often been faced with exactly the same expert testimony offered by what at times appears to be a traveling road show of attorneys and consultants. In hindsight, it would have been better for the JPML proceedings to have continued longer than they did and to have the basic causation issue of the interrelationship between acute inflammatory polyneuropathy (AIP) and the chronic CIP form resolved by a panel of experts handing down a decision that would be binding on the trial courts in subsequent proceedings. Unfortunately, the development of the CIP presentations by the plaintiffs seems to have occurred largely after the JPML proceedings had been concluded, so perhaps the potential for conflicting trial court decisions could not have been foreseen.

This court, in assessing the testimony of the experts, notes that some of the confusion is caused by the evolving history of the medical literature on the subject. Although GBS was probably first described as early as 1859, the syndrome takes its name from a 1916 description by Drs. Guillain and Barre (a Dr. Strohl who contributed to the description was not destined to be historically preserved in the title). In 1936 an article by Dr. Guillain appeared in the *Archives of Neurology and Psychiatry* entitled "Radiculoneuritis with Acellular Hyperalbuminosis of the Cerebrospinal Fluid." In that article Guillain recognized the number and variety of cases that had been reported under the G–B syndrome and he attempted to delimit the syndrome as precisely as possible. Several of the cases he cited would now be considered chronic rather than acute examples of GBS.

A 1940 article by Dr. Russell DeJong, again in the *Archives of Neurology and Psychiatry*, entitled "The Guillain-Barre Syndrome" described six cases which fit the description he summarized of "those in which the course is prolonged or chronic...."

In 1953, Drs. Boshes and Sherman published an article in *Neurology* entitled "Variability of the Course of the Guillain-Barre Syndrome." The doctors observed that many cases involved a chronic rather than acute situation.

In 1967, Drs. Hinman and McGee published an article in the *Annals of Internal Medicine* entitled "Guillain-Barre Syndrome with Slow Progressive Onset and Persistent Elevation of Spinal Fluid Protein." The doctors concluded; "We believe this chronic form represents a poorly-appreciated and often misdiagnosed variation of the characteristic syndrome."

In 1969 Dr. P.K. Thomas, with others, published an article in *Brain* entitled "Recurrent and Chronic Relapsing Guillaine-Barre Polyneuritis." The authors presented five cases which pursued a chronic course and concluded that these cases presented variants of the same process that causes acute GBS, but with a different time course.

More significantly, in that same year Drs. Asbury, Arnason and Adams published an article entitled "The Inflammatory Lesion in Idiopathic Polyneuritis." Idiopathic polyneuritis is one of the many synonyms found in the medical literature for GBS, and the authors made it clear in their article that when they talked about idiopathic polyneuritis they were referring to GBS. The significance of this article is that one of the authors was Dr. Barry Arnason, a most respected neurologist. In 1975, Dr. Peter Dyck, who has testified frequently in GBS litigation, joined with others in editing a two volume textbook on *Peripheral Neuropathies*. This is regarded as one of the most authoritative publications in its field. Chapter 56, dealing with GBS, was authored by Dr. Barry Arnason. The title of the chapter was "Inflammatory Polyradiculoneuropathies." In that chapter Dr. Arnason described the variability of the course of GBS and expressed his opinion that "the majority of slowly progressing sporadic cases of chronic neuropathy represented variants of acute inflammatory polyradiculoneuropathy."

Other treatises followed with identification of a chronic form of GBS until 1984 when, during the height of the GBS swine flu litigation, Dr. Dyck published the second edition of *Peripheral Neuropathies* in which he separated AIP and CIP into two chapters. Since that time, there has been an increasing volume of literature and much trial testimony by various neurologists to the effect that chronic inflammatory polyneuritis (CIP) is a different syndrome from acute inflammatory polyneuritis (AIP), which is the only true GBS.

Faced with sharply conflicting expert literature and equally conflicting expert testimony trial judges have understandably issued conflicting decisions. The government, in its draft submission, asked the court to find that the plaintiff's experts in this case are members of a "traveling road show" participating in swine flu suits all over the United States, with testimony that is "result—oriented." However, the court's reaction to the expert testimony presented by both sides was that it was well-polished and in many instances the result of repeated exposure to both direct and cross-examination by the same sets of attorneys. Consequently the court examined the expert testimony in minute detail with great care.

With respect to the testimony offered by the biochemists, Dr. Edwin Eylar for the plaintiff and Dr. Steven Brostoff (an immunologist) for the government, the court could not reach a conclusion based solely upon their testimony. Dr. Eylar stated that he found P2 protein in antibodies in Mr. Baker's blood, indicating to a high degree of scientific certainty that Mr. Baker's GBS was in fact caused by his swine flu vaccination. On the other hand, Dr. Brostoff, who supervised tests of lots of the swine flu vaccine at a later period (1983), found no P2 in the tested lots.

More significant than testimony of the biochemists were the opinions offered by the neurologists. On the one hand, Dr. James O. Donaldson and Dr. Allan H. Ropper testifying for the defendant concluded that the plaintiff did not ever have CIP and that it is not customary for a chronic condition to be followed by an acute condition, although "smoldering" may occur *after* AIP, rather than before. These experts claimed that the majority of current neurologists distinguish between GBS and CIP. In contrast, Dr. Peter Lichtenfeld testifying in behalf of the plaintiff cited the earlier literature in support of a CIP variant of GBS, and refuted the importance of the nerve conduction tests heavily relied upon by Dr. Donaldson for his conclusion.

The court, having examined all of the many prior decisions by other federal judges in swine flu litigation, finds the recent comments of two to be both pertinent and helpful.

In *Manko v. United States*, 636 F.Supp. 1419, 1428 (W.D.Mo.1986), Judge Bartlett, ruling in favor of the plaintiff in a case remarkably similar to the facts of the instant situation, made the following significant comments:

"1. Smoldering Guillain-Barre Syndrome

Two neurologists testified on behalf of plaintiff. Dr. Peter Lichtenfield (sic) is a neurologist in private practice in Long Island, New York, with teaching appointments at the Cornell University Medical College and the State University of New York. Dr. Lichtenfield is the former head of the Division of Neurology at the Roger Williams General Hospital. Dr. Milton Alter is the Chairman of the Department of Neurology at Temple University Hospital. Dr. Lichtenfield and Dr. Alter both had extensive experience in the diagnosis and treatment of GBS.

Based on the credible testimony of Dr. Lichtenfield and Dr. Alter, the Court is convinced that the symptoms of GBS can be manifested either suddenly (acute GBS) or over a period of time (smoldering or chronic GBS). According to Dr. Alter, GBS is technically defined as being both chronic inflammatory polyneuritis and acute inflammatory polyneuritis. Both neuropathies involve the same immune mediated process. The distinction is the length of time it takes symptoms to develop. The chronic or smoldering form of GBS is characterized by a slow progressive period of onset with gradually worsening neurological impairments such as tingling in the hands and feet, fatigue, light-headedness and weakness in his legs.

Defendant's neurologists, Dr. Barry Arnason, Chairman of the Department of Neurology at the University of Chicago and a noted expert in the field of neuroimmunology, and Dr. Maurice Victor, Professor of Neurology at Case Western Reserve University School of Medicine and Chairman of the Department of Neurology at Cleveland Metropolitan General Hospital, testified that GBS exists in a single form characterized by rapid onset of weakness, with the acute phase reaching its zenith in approximately one to four weeks, followed by stabilization of the neurologic process and then a lengthy recovery.

Although Dr. Arnason and Dr. Victor have excellent credentials, the Court was not persuaded by their insistence that GBS occurs only in the acute form. The first edition of a textbook titled "Peripheral Neuropathy" authored by Peter Dyck, Peter Thomas and Ed Lambert, which Dr. Arnason testified was the standard textbook for peripheral neuropathy, states that the acute form and chronic form of GBS are variants of the same disease and that 'the majority of slowly progressing sporadic cases of chronic neuropathy represent variants of acute inflammatory polyradiculoneuropathy....' Tr. 13–134; Plaintiff's Exhibit 2. Recently, Dr. Arnason co-authored Chapter 91 of the second edition to reflect the author's view that the chronic and acute neuropathies are separate and distinct entities. The coincidence of the involvement of Dr. Arnason in the nationwide GBS litigation, the changing of his opinion about the existence of chronic GBS and the rewriting of the textbook to reflect his new opinion, casts a shadow

over the change in opinion. In short, the Court was not persuaded that absent the GBS litigation, this change in opinion would have occurred."

Likewise in *Storrer v. United States*, 662 F.Supp. 18 (N.D.Ohio 1986), Judge Walinski, in his Findings and Conclusions dated September 4, 1986, at page 21, reviewed the expert testimony and reached the following conclusions:

"Specifically, defendant claimed that Carol was suffering from chronic inflammatory demyelinating polyradiculoneuropathy (CIDP), which defendant claims is a separate disease entity from acute inflammatory polyradiculoneuropathy (GBS).

To support the contention that Carol was suffering from CIDP, defendant presented the testimony of two eminent clinical neurologists, Dr. Peter J. Dyck and Dr. Raymond D. Adams. Dr. Dyck, who is a Professor of Neurology at the Mayo Clinic Medical School, testified that historically, CIDP has been known, *inter alia*, as chronic relapsing polyneuritis, chronic GBS, relapsing GBS and chronic demylinative polyneuritis. After a three day examination and extensive testing of Carol, Dr. Dyck determined that Carol contracted CIDP and that in his opinion CIDP is a separate and distinct disorder from GBS. Similarly, Dr. Adams, who is a Senior Consultant in Neurology at the Massachusetts General Hospital in Boston, testified by videotape that Carol contracted chronic relapsing polyneuritis and that CIDP and GBS are distinct disorders. Among the reasons Dr. Adams gave for separating the two disorders are history, course, and response to corticosteroid treatment.

Defendant also presented the testimony of Dr. John Crossen, a pathologist and immunologist at the Minnesota Hennepin County Medical Center, and Dr. Arthur Asbury, a neurologist. The testimony of each of these experts supported defendant's claim that CIDP and GBS are two distinct disorders. In his deposition testimony offered in the Swine Flu case of *Styer v. United States*, No. 79–3489 (E.D.Pa.), Dr. Asbury explained

that the differences between GBS and CIDP are expressed in temporal evolution, outcome or prognosis, and association of preceding events.

Plaintiffs argued that most of the differences between GBS and CIDP which were discussed by defendant's experts, were insignificant or simply reflected that the disease process goes on longer in chronic cases. Plaintiffs argued further that although GBS is typically an acute or subacute illness, the chronic form is well recognized in the medical literature. Plaintiff's expert, Dr. Peter Lichtenfeld, described the considerable variability of the GBS. He explained that some patients have relapsing courses, some cases involve recurrent episodes of the disease, and some cases have more chronic or slowly progressive onset of the illness.

After reviewing the evidence presented on this issue the Court is not convinced that a dividing line need be drawn between CIPD and GBS for the purpose of identifying Carol Storrer's illness. The Court concedes that GBS is typically an acute or subacute illness in which the disease peaks about one month after the onset of symptoms. There is, however, a long list of cases in which it is recognized that GBS may also take a more chronic form and may peak many months after the onset of the original symptoms. *See,* e.g., *Annie M. Barnes v. U.S.A.* [525 F.Supp. 1065], No. 78–64–S (M.D.Ala. October 29, 1981); *Grubbs v. U.S.A.* [581 F.Supp. 536], No. S 80–323 (N.D.Ind. Feb. 29, 1984); *Dillard v. U.S.A.*, No. CV 479–17 (S.D.Ga. October 30, 1981); *D'Antonio v. U.S.A.*, No. C–1–80–578 (S.D. Ohio Feb. 10, 1983); *Vesperman v. U.S.A.*, No. B–80–662 (D.C.Md. June 20, 1983).

Accordingly, after careful review of the NINCDS criteria, the expert testimony presented by both defendant and plaintiffs, and the testimony of the plaintiff, herself, the Court concludes that Carol Storrer did, in fact, contract GBS."

▄ This court concludes, as did Judges Bartlett and Walinski, (as well as many

other judges in the cases cited by Judge Walinski) that although acute GBS is the most common form of the syndrome, the existence of the chronic aspect has never been definitively ruled out by the experts.

The question then arises as to whether this particular plaintiff, Richard C. Baker, suffered from a chronic form of GBS which then flared into acute GBS, and whether all of this was caused by the swine flu vaccination. The court, placing emphasis upon the testimony of the fact witnesses, finds that more likely than not the forms of GBS, both chronic and acute, which the plaintiff claims to have suffered were indeed experienced, and were caused by the swine flu vaccination.

The court credits the testimony, not only of the plaintiff himself, but also of the daughter, Donna Killay, and the friends and former neighbors, Gerard and Theresa Jalbert. The court finds that the medical history has been substantiated to the effect that the plaintiff did suffer the peripheral weakness manifested by periodic fall-downs from the middle of December, 1976 and until the onset of the acute GBS in June, 1977. The court finds that the plaintiff did experience the numbness in the legs which caused him to constantly rub them, and that he did tire easily and began to experience general difficulty in movement.

Most significant to the court, however, is the testimony of Dr. Robert Malone, the Baker's family physician, who testified on the fifth and final day of the Court trial. Dr. Malone had not been expected to testify and both parties had used his deposition in the course of preparing their trial briefs, filed prior to the presentation of the evidence. At the time of his deposition, and when he wrote a letter to the Department of Justice which was presented as an exhibit, Dr. Malone had been relying upon his recollection without the benefit of his office notes, which he had not been able to locate. That pre-trial testimony indicated that Dr. Malone had treated Mr. Baker on June 13, 1977 for an upper respiratory infection. This was a most important element of the government position, which was that it is a relatively common event for GBS to be preceded within a very few days or weeks by a viral infection. Since the acute GBS was diagnosed on June 18, 1977, by Dr. Sena, a neurologist at Milford Hospital, the government stressed in its proof that Dr. Malone appeared to have diagnosed an upper respiratory infection on June 13th. Nevertheless, when Dr. Malone testified at trial, with the benefit of his notes, he stated emphatically and repeatedly, in answer not only to questions from counsel but also questions from the court, that he had found no upper respiratory infection in the plaintiff as of June 13th, but instead had found only a smoker's cough which could not explain what happened to the plaintiff within a very few days thereafter. Dr. Malone called it an amazing and dramatic deterioration.

Having reviewed all of the testimony and exhibits, the court now enters its conclusions as follows.

## CONCLUSIONS

In actions under the Federal Tort Claims Act, the liability of the United States is governed by the law of the place where the alleged tort occurred. 28 U.S.C. 1346(b), 2674; *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). Since Mr. Baker received his swine flu vaccination in Connecticut and became ill in Connecticut, the law of Connecticut applies in this case. In Connecticut, the plaintiff must show not only duty and a breach thereof, but proximate cause between the defendant's act and the plaintiff's injury. *Boehm v. Kish*, 201 Conn. 385, 517 A.2d 624 (1986); *Catz v. Rubenstein*, 201 Conn. 39, 513 A.2d 98 (1986). As applied in a swine flu case being tried pursuant to the stipulations of the JPML, causation is the only issue for this court.

■ The court concludes under the civil standard of preponderance of the evidence that the plaintiff has proved that more likely than not the swine flu vaccination caused his GBS.

The court, finding the liability issues in favor of the plaintiff, will schedule further proceedings with respect to the damages

issues which remain open for decision following presentation of evidence.